Our second case for this morning is another Social Security case, Knapp v. Berryhill. We'll hear again from Mr. Rodman. Mr. Rodman May it please the Court, my name is Jason Rodman and I represent the appellant Vicky Lynn Knapp. This is a Social Security step 5 ruling. I am going to stop at 3 minutes to reserve time for rebuttal. With it being step 5, the SSA, and I'm quoting here from the Clifford case cited in the briefing, the SSA has the burden of establishing that Knapp has the capability of performing other work in the national economy. And so through my points today I'm going to show how that burden was not met. First off, with the chemotherapy residuals, notably things like neuropathy not properly accounted for in the residual functional capacity. And secondarily, in terms of the SSA examiner, Dr. Bowen, Dr. Bowen opined that she would have trouble concentrating, staying on task, and remembering what asked to do. I will be showing that that should have been credited. In terms of the neuropathy and other limitations, and really this gets to Dr. Kidder's opinion, he didn't just say she couldn't work. He started in, lead statement was that the breast cancer, and then other things such as the neuropathy, were going to be in a difficult state, and I'm paraphrasing here a little bit. So how does the neuropathy relate, for example, I'm looking at page 16 of 17 of the ALJ's decision, where the vocational expert testifies that there are these jobs such as addresser, surveillance system monitor, document preparer, and final assembler. How does the neuropathy relate to those? Well, I would think that that relates to the ability to use the hands, the extent to which the neuropathy is on the extremities. It's a peripheral neuropathy. Right. And so it comes into the hands, and this kind of sneaks into my second argument, so I'll on the record, which dovetails with, Dr. Bowen isn't the longitudinal person, isn't the longitudinal doctor, but the impairments he opines about coincide with the sorts of things connected to chemo brain. Chemo brain isn't the sort of thing that one goes back to work with without some kind of accommodations, and with her, she did go back to work, and so presumably was managing, had some strategies that really worked until her impairments in combination, I think probably most notably the depression, specifically diagnosed major depression, depressive disorder, sort of ganged up and knocked off that whatever delicate balance she was able to do, and kept her from continuing to work. Which is to say, connected to Dr. Kidder's observations, it seems to be implicitly, again, the residuals from the chemotherapy. Now, the other thing that feels appropriate to point out in an oral argument is that sort of opinion that Dr. Kidder made, which was specific in terms of first off breast cancer and then these other things, and also the specific approximate two year period, it mirrored an earlier opinion that admittedly was before the formal time period, but was before she started the cancer, or the cancer therapy, specifically the chemotherapy. She, Dr. Geis, the cancer doctor, opined that it would be at least a solid year and all these different things were going to go downhill significantly, and I think if you look at the record, the extent of time that she was under chemotherapy, it's more than most folks under chemotherapy go through. So I mean, if I could just summarize, tell me what the essence of your complaint is. Is it failure to deal with the adverse evidence from Dr. Bone and Dr. Kidder, or is it a problem with the definition of her RFC, or what would you say your key points are? Well, the take home, if you will, I believe needs to come back to the RFC, and this leads more to the second argument than the first, but in terms of, and I'll point to the Beardsley case here, they talked about how these non-examining consultants, just because you've got that, where that combines with conservative treatment, and the non-examining consultant is not consistent with the description of the activities that she's dealing with, then that is not good enough to overcome a CE, a psychological, or a consultative examiner of physicians. Someone who actually looked at her, yes, I understand. And Mr. Rott, here's what I thought you were going to say your best argument was, that the regulations, as I read them, require that the RFC be based on all relevant medical evidence. And here you have Dr. Kidder, who treated Ms. Knapp, if I read the record right, going all the way back to 2006, but all of Dr. Kidder's findings, especially a lot of his notations and his medical notes, are not sufficiently accounted for in the ALJ's analysis. I agree with that. Kidder's the treating physician. I agree with that analysis, and my lead applicable case in that regard, I think, would be the Clifford case, where they specified it out. It's not just the longitudinal record, but also the treating doctor's understanding of the conditions and circumstances that the claimant is going through. And so I don't disagree that that argument has salience, but the test for the residual functional capacity is everything in combination. So I think both opinions come into play. Both means Kidder and Bone? Yes. Yeah, okay. Their findings seem to complement one another, don't they? I think that's right, Your Honor. And I'd like to reserve time for rebuttal, unless there were other questions. I see none, so you may do that. All right, Ms. Godfrey. May it please the Court, Jean Godfrey, on behalf of the Acting Commissioner of Social Security. This Court should affirm the ALJ's finding that Ms. Knapp was not disabled. The ALJ thoroughly reviewed the record evidence, reasonably weighed the medical opinion, and issued a detailed 17-page decision, finding that Ms. Knapp could perform a limited range of sedentary work. The ALJ provided sound and well-supported reasons for discounting the opinions of treating physician Dr. Kidder and consultative examiner Dr. Bone. But she doesn't actually uniformly disregard Dr. Kidder. She picks, she disregards him when it's not favorable to a finding of ability to work, and she looks at him when it is favorable to the finding that she wants to make. So I see a real inconsistency in her approach to Dr. Kidder. I just don't know that it, so she says over on page 13, she's making findings based on Dr. Kidder's actual clinical observations, but earlier on she said that Dr. Kidder isn't an orthopedist, and so what does he know, and it's, actually it's not consistent, and one thing that the ALJs are not supposed to do is, as everybody refers to it, cherry-pick. Well, Your Honor, Dr. Kidder provided two identical opinions that the ALJ weighed under the regulatory factors, and then she separately, or he separately also considered the objective findings of Dr. Kidder and Dr. Kidder's treatment notes. When you're talking about, when you refer to Dr. Kidder's two opinions, you're referring to the very brief April of 13 and October of 13, the one paragraph? Correct. But aren't those best read against the backdrop of his treatment notes as well, which are part of the record, right? Those are part of the record, but under the regulatory factors, an ALJ must consider the supportability that a medical source provides, and in that exact letter, he only indicated the support for his opinion that she could not work was the combined impact of her medical conditions. He did not actually reference any earlier treatment records or any medical findings or any functional limitations. But it was in the record. That's the problem. I mean, he's, Ms. Knapp, through her lawyer, is certainly arguing that there is a lengthy and deep treatment relationship, and the ALJ doesn't mind looking at those clinical notes for other purposes. It's not as though the ALJ says, I'm just putting blinders on, I'm not going to look at Dr. Kidder's notes at all. The notes are mentioned repeatedly through the opinions. So if the notes are pertinent, then these two rather summary things should be read against the backdrop of the notes. He's just giving the bottom line. He's available. All the rest of the stuff is in there. Are we going to deny her benefits because he doesn't write a 15-page exegesis? Well, the ALJ, in the residual functional capacity finding, found that Ms. Knapp was very limited. He found that she could perform sedentary work, which involves standing or walking for no more than two hours out of an eight-hour workday, and that she could use a cane for prolonged walking and walking on uneven surfaces. She could never climb ladders, ropes, or scaffolds. Those things drive me crazy in these RFCs. I don't know how many jobs you've had where you've had to climb ropes or scaffolds, but  I'm looking at the RFC, and this is a woman who's got serious psychological problems. She's on Percocet, which is not a minor drug. She's got pain. She's obese. She can only clean part of the house each day because she's got to rest. We frequently have mentioned that cleaning up the bathroom and the kitchen and then taking a nap isn't the same as having a job. Well, Your Honor, the ALJ did consider her reports that she cooked and cleaned and did laundry with help from her children, but she also reported more vigorous activities, such as camping every other weekend, despite her mental limitations. Why is camping vigorous? I could imagine somebody who camps who gets someone to drive them out to a camping site, then they sit down in one of those folding chairs and enjoy the forest, and then they lie down. Why is camping vigorous? Well, we don't know the extent of the camping here. That's the point. You don't know. Certainly, you're one of these people who's scaling mountains. That's a different thing, but we don't know. Correct, but that was relevant evidence for the ALJ to consider in weighing her allegations. Only if it sheds some light on how active she was, and you've just admitted that it didn't. Well, with respect to her mental limitations, she alleged difficulty concentrating, and yet she did admit that she was able to continue working well after she stopped undergoing chemotherapy treatment in 2008. But Mr. Rodman says she did indeed work for a while, to her credit, but when the depression kicked in, she just couldn't. That's one of the classic signs of depression, you just can't manage to get yourself out of bed. Regarding the depression, she testified at the hearing that her depression and anxiety were both well-controlled by medication, and she did not believe that those impairments  And she's the expert? I mean, you wouldn't accept that from a doctor. You'd say, oh, that's up to the ALJ to decide. Well, an individual's own statements regarding their limitations and symptoms are highly relevant for an ALJ to consider in evaluating the severity of those impairments. See, I think this brings us back, at least in my mind, it brings me back to the point that Judge Wood's making about a concern about cherry-picking, because I think you're right that that is the way she testified, but she also testified that she has serious problems concentrating and with her memory. So we can't focus, on the one hand, on her saying my mood's okay, but I can't concentrate and I can't remember anything, which is probably what led her to stop working at, what was it, Taco Bell along the way? That was her last job, yes. Right, right. Well, regarding the concentration, the ALJ reasonably found that the longitudinal record did not support her allegations that she was unable to concentrate. She had adequate concentration during exams with the Bowen Center. Dr. Kidder noted that Adderall helped improve her concentration. But improve is different from cure, I suppose. You know, where I'm looking for is something that grapples with the evidence that she really can't concentrate sufficiently to manage a full-time job. Now, I realize the ALJ limits her from fast-paced work, such as assembly line, limits her to superficial interaction with other people, you know, but admits contact with supervisors still involves necessary instruction. If she forgets the instruction, has to be re-instructed constantly. Most employers don't want that. And did the VE so testify? Well, in addition to the evidence I just mentioned, the ALJ also found that Dr. Bowen's own objective test results did not support his opinion that her concentration, she could not concentrate. In 2014, his test results revealed that her concentration and short-term memory were both only moderately below normal. Her long-term memory was normal, and her immediate recall was mildly normal. So here we have objectives. Remind me, she's the one who's having problems doing serial sevens? Yes. During the first exam in 2012, she could perform one serial seven subtraction. But during the second one in 2014, she was able to perform five serial seven subtractions. She could recall three out of three objects immediately, one out of three after five minutes. That's pretty pathetic. One out of three objects after five minutes? And she's supposed to be working? The examiner found that those test results revealed that her concentration was only moderately below normal. She was also able to count backwards from 20 to 1 and complete other math calculations. So these test results in combination with the treatment record notes revealing that Adderall did help, she reported that to her treating physician, that it helped. And during exams with the Bowen Center, she was observed to have adequate concentration. In addition, Dr. Kidder did not perform any psychometric testing of her memory or concentration to support the conclusory opinion that she was simply unable to work. So the ALJ reasonably relied on the longitudinal record evidence regarding her concentration. And just to be clear, you are relying quite a bit on treatment notes? Yes, in addition to the objective test results. All right. Exactly. If the court has no further questions, we ask that you affirm ALJ's finding that Ms. Knapp is not disabled. All right. Thank you. Anything further, Mr. Rodman? Briefly, Your Honor. I agree that the claimant here, Ms. Knapp, she did not, she testified that she didn't think the depression by itself kept her from working, but that's not the test. It's everything in combination. So she's alleging an onset date of June 29, 2012. Is there anything magical about that date? Do you mind if I grab a... No, go ahead. Excuse me. June 29, 2012. I believe that's actually when she had a, after she had a panic attack at Pizza Hut. I think... So in other words, it was a time when the psychological disability was starting to overlap with the physical problems. That's right. And so the commissioner, I think, made a slight mistake suggesting Taco Bell was the last employment, was the last substantial, gainful, ongoing employment. But she tried to go back and work at Pizza Hut for a little bit. Yeah, that was only a couple of weeks, right? Something like that, yes. Yes, Your Honor. And just to elaborate on that a little bit, I wanted to draw an analogy to another case that is cited and is significant in the record, the Green versus Abfeld case. And that case isn't actually about psychological symptoms, but it has, it goes in detail about some principles that overlap. And so, for example, it talks about, you know, some PFT tests that came, you know, were sort of, I mean, I won't use the word dicta, but the PFT tests were coming back normal at some point. What's a PFT test? Sorry, pulmonary function test. It's a whole different type of animal. But the principle applies in that when, just because there are spare moments or just because there are spare citations into the record, doesn't mean that the broader effect doesn't need to be considered. And in this context, the history of the chemotherapy and the depression and the fact that major depression, depressive disorder was diagnosed. I would also like to underscore the Step 5 burden that I began with today, that NAP's begun with today, which is that the jobs that the administrative law judge seems to have selected seem to be ones like a dresser involving quite a bit of concentration and detail orientation. And that's one reason in the opening brief NAP goes into detail about the concentration and detail orientation involved in, say, the optical assembler, which is what that assembly job actually is. Okay. For these reasons, we ask for a remit. Thank you. All right. Thank you very much. Thanks to both counsel. Take the case under advisement.